## ELDRED VS. SEXTON.

### PUBLIC LANDS.

1. An act of Congress, in 1856, (11 U. S. Stats. at large, 20), granted to the state the odd-numbered sections of land within certain limits, to aid in constructing a railroad, and provided that the even-numbered sections should not be sold for less than double the minimum price of public lands (i. e. not less than $2.50 per acre), and should not be subject to private entry until first offered at public sale at the increased price. The railroad not having been located as contemplated by said act, Congress subsequently, by joint resolution, provided that said even-numbered sections should thereafter "be sold at one dollar and twenty-five cents per acre." *Held,*

(1) That the effect of this resolution was simply to restore said land to the general body of the public domain, and subject them to sale under the then existing general laws relating to the sale of public lands.

(2) That said lands (although they had once been offered at public sale, under the previous act, at the minimum of $2,50) did not become subject, by such resolution, to private entry at $1.25, until first offered at public sale at that reduced minimum.

2. The construction which has always been given by the different executive departments of the federal government to the laws providing for sales of the public domain, while it may not be absolutely binding upon the courts, is entitled to very great weight, and should not be overruled in any particular case unless clearly erroneous.

APPEAL from the Circuit Court for *Dane* County.

The object of this action is to compel the defendant to convey to the plaintiff, certain lands described in the complaint, situated in the county of Oconto. The facts of the case, as they appear from the pleadings, evidence and findings of the circuit court, are as follows:

By an act approved June 3d, 1856, Congress granted to the state of Wisconsin, for the purpose of aiding in the construction of a railroad from Fond du Lac northerly to the state line, every alternate section of land designated by odd numbers, for six sections in width on each side of such contemplated railroad. Section 2 of the act provided that the lands remaining to the United States, being the even-numbered sections, should not be sold for less than double the minimum price of the public lands, that is, for not less than two dollars and fifty cents per acre, and that such lands should not be subject to private entry until they had been first offered at public sale at the increased price. 11 U. S. Stats. at Large, 20. This grant was made upon certain terms, conditions and restrictions contained therein, and was accepted by the state, subject thereto. Laws of 1856, ch. 118. Subsequently the state granted the same lands, subject to the same restrictions, conditions and obligations, to a corporation created for the purpose of taking such grant and building the railroad contemplated by it, and known and designated as the "Wisconsin and Superior Railroad Company;" (Laws of 1856, ch. 137,) and pursuant to chap. 17, Pr. and Local Laws of 1857, and chap. 108, Pr. and Local Laws of 1859, (and perhaps other laws,) and by the action of the several corporations therein named, such land grant became vested in the Chicago and Northwestern Railway Company.

Before 1859, the line of such railroad had been located and the lands affected by the grant had been surveyed and ascertained, but none of them had been put in market. The lands in controversy in this action are all within six miles of such line and in even sections, and the same were duly offered at public sale, at two dollars and fifty cents per acre, on the 3d day of May, 1859, pursuant to a proclamation of the President of the United States, but were not sold.

By a joint resolution of Congress, approved April 25, 1862, a change in the line of railroad thus located was authorized, but

no change was made in the quantity or location of the lands thus granted to the state, in aid of the construction thereof. The joint resolution provided, however, that the even sections within six miles of the new line, should be sold at the same price and in the same manner as those on the originally located route, and that purchasers who had paid the increased price for lands on such original route, might, without further payment, enter an equal quantity of lands subject to private entry, at one dollar and twenty-five cents per acre, in the Menasha land district. It also provided that the even sections reserved to the United States along the originally located route, by the act of June 3, 1856, should thereafter be sold at one dollar and twenty-five cents per acre. 12 Stats. at Large, 618. A change of the route of such proposed railroad was thereupon made, and the lands in controversy are more than six miles from the new line.

After such change, and in December, 1865, and January and March, 1866, the plaintiff made application at the land office, in Menasha, (in which district said lands are situated,) to enter the lands in question, and did purchase the same at private entry at one dollar and twenty-five cents per acre, and the proper officer made and delivered to the plaintiff the usual duplicate certificates of such entries.

In October, 1866, said lands were offered at public sale at the latter price, pursuant to a proclamation of the President, but were not sold.

On the 8th of November, in the same year, the commissioner of the General Land office, at Washington, cancelled the entries thus made by the plaintiff, on the ground that the lands had never been offered at public sale at the minimum price of the public lands, and were not therefore subject to private entry. On appeal, this action of the commissioner was approved and affirmed by the Secretary of the Interior. No patents for these lands were issued to the plaintiff.

In accordance with instructions from the general land office, due notice was given that said lands would be held subject to

private entry at one dollar and twenty-five cents per acre, on and after the 17th of December, 1866, and on the 19th of the same month the defendant purchased the same at private entry at said land office at that price, and received from the proper officer the usual duplicate certificates of such entries, upon which patents have since been issued to him by the United States.

The circuit court further found that when he made such entries, the defendant was chargeable with constructive notice of the entry of the same lands by the plaintiff, as above set forth, and that the plaintiff has not received back the price or consideration which he paid therefor.

That court held that when such entries were made by the plaintiff, the lands were not subject to private entry at one dollar and twenty-five cents per acre, and that he thereby acquired no right, title or interest in or to the same, and thereupon the court gave judgment for the defendant. From that judgment the plaintiff has appealed.

*Carys & Cottrill*, of counsel for appellant.

*Gregory & Pinney, contra.*

LYON, J. From the foregoing statement of facts, it is apparent that the controlling question to be determined is, were the lands in controversy subject to private entry at one dollar and twenty-five cents per acre at the time the plaintiff entered the same? If this question be answered in the affirmative, the plaintiff is the equitable owner of the lands, and entitled to the relief demanded in the complaint; and in such case the judgment of the circuit court is erroneous, and should be reversed. But if the lands were not then subject to private entry, the plaintiff has no interest in them, (his entry thereof having been duly cancelled), and the complaint was properly dismissed.

It is claimed by the counsel for the plaintiff, in the very able argument which he has submitted to this court, that these lands, when entered by the plaintiff, were subject to private entry by

virtue of section 4 of the joint resolution of April 25th, 1862. That section is as follows:

"*And be it further resolved*, That the even sections of the public lands reserved to the United States by the aforesaid act of June 3d, 1856, along the originally located route of railroad north of the said town of Appleton, and along which no railroad has been constructed, shall hereafter be sold at one dollar and twenty-five cents per acre." This provision is applicable to the lands in controversy.

This section contains no express provision that the lands shall be subject to private entry at that price, and we find nothing therein from which we can infer that Congress so intended. In the latter particular, it is unlike the act to graduate and reduce the price of the public lands to actual settlers and cultivators, approved August 4th, 1854, which employs language similar to that of the resolution. 10 Stats. at Large, 574. That act provides for a reduction in price in favor of actual settlers and cultivators only, and, from the nature of the case, such persons could only obtain the benefits which Congress intended to confer upon them, by being permitted to purchase at private sale. Hence the inference is irresistible that Congress intended to confer that right upon such persons. It seems, therefore, that the argument of the learned counsel predicated upon the language of that act, is unsound.

The counsel also argues very ingeniously, that because very many acts directing a public sale of lands, provide that the same shall not be sold for less than a given price per acre, while the joint resolution provides that the lands in controversy shall be sold at a given price, using the form of expression in that behalf contained in other acts authorizing sales at private entry, therefore private, and not public sales, were intended by the resolution.

While it may be conceded, that the latter form of expression may be more appropriately used in providing for a private sale, where the price must necessarily be fixed, yet it would be

giving an undue importance to mere forms of expression, to allow such a consideration to control the construction to be given to a statute. We think the resolution has the same force and effect that it would have if it provided in terms that the lands should not be sold for less than one dollar and twenty-five cents per acre. Were this otherwise, if there is so wide a difference between the two forms of expression, as is claimed to exist, it would seem to follow that the lands must be sold at all events at the fixed price — no more and no less; and yet it is conceded, that should two persons apply at the same time to purchase a given parcel, it might lawfully be sold to him who would pay the highest price therefor, beyond the price fixed by law. In that case, certainly, if in no other, a fixed price per acre means nothing more than that the land shall not be sold for less than that price.

Our conclusion is that the effect of the joint resolution was to restore the lands in controversy to the great body of the public domain, and to subject them to sale under then existing general laws relating to the sale of the public lands.

It is further claimed on behalf of the plaintiff that, although the joint resolution did not render the lands in controversy subject to private entry, yet, inasmuch as they had once been offered at public sale under the act of June 3d, 1856 (although at an increased minimum price), they became subject to private entry by virtue of such general laws, at the reduced minimum price, without being again offered at public sale at such reduced price.

The law is well settled, that sales of the public lands at private entry, are never permitted until after the lands have been offered at public sales, unless by virtue of some special act of Congress authorizing them to be thus sold. This is not denied. We have already seen that there is no such special act in respect to the lands in question.

In order to ascertain whether the offer of these lands at public sale at two dollars and fifty cents per acre is a compli-

ance with this requirement of law, so as to render them subject to private entry at the reduced price, it is necessary to consider the objects of such requirement, and to ascertain whether such offer at public sale secured these objects.

It is very evident that the purposes sought to be accomplished by requiring the public lands to be offered at public sale before they become subject to private entry, are, 1. To give all persons an equal opportunity to purchase the same; and 2, To give the government the benefit of the increased price which might result from competition. It seems apparent that neither of these purposes was accomplished by the offer of the lands at public sale at a minimum price of two dollars and fifty cents an acre. Although they were not sold at such increased price, it by no means follows that there were not persons who were willing to pay more than one dollar and twenty-five cents per acre therefor, and would have done so had the opportunity been given them by a public sale, after the minimum price was reduced and before the plaintiff made his entries. It is true, that when so offered at the reduced price, they were not sold, but this does not affect the principle involved. The facts that certificates of entry had been previously issued to the plaintiff, and that he claimed to own the land by virtue thereof, may have prevented competition at such sale. It seems to us that when the plaintiff attempted to purchase the lands at private entry, no equal opportunity had been given to all persons to purchase the same at the reduced price, and that the government had not had the benefit which might have resulted from competition between persons desiring to purchase the same parcels. It is not perceived how these objects could be accomplished in any other manner than by again offering the lands at public sale, upon due notice, after their condition was changed by a reduction of the minimum price.

If these views are correct, it necessarily follows that the lands were not subject to private entry when the plaintiff entered the same, and that his certificates of entry were properly cancelled.

by the land officers of the government.   We have thus adopted the construction which has always been given by the different departments of the government, to the various laws providing for sales of the public domain, and while their construction of those laws may not be absolutely binding upon the courts, yet it is entitled to very great weight and should not be over-ruled in any given case unless clearly erroneous.

Many other questions of minor importance were argued by counsel, but the view we have taken of the controlling question in the case, renders it unnecessary to consider them.

*By the Court.* — The judgment of the circuit court must be affirmed.